UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                         x   98 Cr. 1038 (SWK)
UNITED STATES OF AMERICA,                x
                                         x
            -against-                    x   **OPINION & ORDER**
                                         x
MARIO RAMOS,                             x
                                         x
                      Defendant.         x
----------------------------------------X

**SHIRLEY WOHL KRAM, U.S.D.J.**

Defendant Mario Ramos ("Ramos") moves to dismiss the indictment on the ground that he has been denied a speedy trial, in violation of the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161-3174. In brief, Ramos argues that "during the period from the filing of the indictment in this case (September 1998) until his arrest (March 2004), the Government did not arrest or seek to prosecute him in this case." (Def.'s Mem. Supp. Mot. Dismiss 2.) In opposition to the defendant's motion, the Government argues that Ramos was a fugitive during the disputed time period, thus it is not responsible for the delay preceding his arrest. For the reasons set forth below, the defendant's motion is denied.

**I. BACKGROUND**

Ramos is charged with conspiracy for his participation in a cocaine distribution scheme uncovered in the mid-1990s. On July 24, 1996, on the tip of a confidential informant, agents of the Federal Bureau of Investigations ("FBI") seized 174 kilograms of

cocaine in Washington Heights. Over the next 26 months, the FBI,
through wiretaps, informants, and other surveillance techniques,
conducted an investigation into a cocaine distribution
organization in that neighborhood, eventually filing a criminal
complaint against Ramos and more than a dozen other individuals
on September 14, 1998. An arrest warrant for Ramos was issued on
that same day. The next day, law enforcement attempted to arrest
Ramos in his residence at 72 Wadsworth Terrace, Apartment #1C.
He was not present, but law enforcement searched the apartment,
interviewed his wife as to his whereabouts, and arrested several
of his co-conspirators in the building. (Government Mem. 2, Feb.
13, 2006.) Ramos was indicted for conspiracy to distribute
cocaine on September 24, 1998. A second arrest warrant was
issued in October of that year.

Around the same time as their search of the Wadsworth
apartment, the Government entered Ramos's information into three
law enforcement databases: the National Crime Information
Computer ("NCIC"), the FBI's Automated Case Support System
("ACS"), and the Drug Enforcement Coordinating System ("DECS").
By virtue of the entries in these databases, Ramos's information
was available to law enforcement throughout the nation, from the
FBI and Drug Enforcement Administration ("DEA") to United States
Customs officials and local law enforcement. Ramos's information

remained in these systems during the entire period of his absence. (Hr'g Tr. 31-34, 46, Feb. 17, 2006.)

Before and after the search of Ramos's apartment, confidential sources, including the informant that provided information leading to the cocaine seizure, told law enforcement agents that Ramos had fled to the Dominican Republic. In an abundance of caution, however, the Government continued to monitor the Wadsworth apartment. From September 1998 until March 1999, law enforcement maintained weekly surveillance of the Wadsworth apartment in an attempt to apprehend Ramos. According to the FBI Agent responsible for this case, Special Agent James Zealor, "[o]n no less than one occasion a week for several hours on each occasion[,] law enforcement officials familiar with Mr. Ramos's appearance would conduct surveillance[] in the area [of] Wadsworth Terrace." (Hr'g Tr. 35.)

Law enforcement questioned numerous cooperating witnesses, co-defendants, and co-conspirators about Ramos's whereabouts. According to those sources, Ramos and his co-conspirators specifically discussed how to avoid law enforcement after the 1996 seizure of cocaine. Those sources also indicated that Ramos was in the Dominican Republic. (Hr'g Tr. 39.) In their attempts to ascertain the defendant's location, law enforcement continued to speak with confidential sources no less than once a week until some time in 2000. (Hr'g Tr. 34-35.) At no time did the

confidential sources or co-conspirators indicate that Ramos had returned to New York. After this two year period of active monitoring, and with no information contradicting their assessment that Ramos had fled to the Dominican Republic, the FBI continued to revisit his file approximately every six months, but received no further information concerning the defendant's location, other than reaffirmations that he was in the Dominican Republic. (Hr'g Tr. 36-37.) Because it did not know the defendant's precise location in the Dominican Republic and the Department of Justice maintained a restrictive extradition policy for that country, limiting extradition requests to violent offenders, the Government never attempted to extradite Ramos. (Hr'g Tr. 37-38.)

On March 2, 2004, Ramos attempted to retrieve a vehicle from an impound lot on the West Side Highway. As part of the lot's administrative procedures, the clerk ran an NCIC check on Ramos to ascertain if he had any outstanding warrants. After noting the existence of outstanding warrants, the clerk notified the FBI as to Ramos's presence at the impound lot. The FBI informed the clerk that agents were on their way to arrest the defendant. By the time the agents arrived, Ramos had left the premises. The very next day, a man and woman arrived to retrieve the same vehicle that Ramos had attempted to pick up. The FBI, which had commenced surveillance operations, tailed the couple

as they left the impound lot. After a short drive down the West Side Highway, the couple rendezvoused with Ramos, who was waiting to take possession of the vehicle. After positively identifying Ramos, agents arrested him. (Hr'g Tr. 43-46.)

After Ramos's arrest, he was appointed CJA counsel, and pleaded guilty before this Court on June 9, 2004. Shortly thereafter, he moved to withdraw his guilty plea, claiming that his attorney had pressured him into taking the plea. The Court approved the assignment of new counsel, and in an opinion dated January 20, 2005, granted Ramos's motion to withdraw his plea. United States v. Ramos, No. 98 Cr. 1038 (SWK), 2005 WL 120230 (S.D.N.Y. Jan. 20, 2005). Approximately a week before the commencement of this trial, I granted an adjournment in order to consider the instant motion.

The defendant's residence during the five and a half years between the September 1998 search of the Wadsworth Apartment and his apprehension in March 2004 is disputed. Ramos contends that he was living openly at the Wadsworth apartment and working in that area during this entire period. In support of his contention, Ramos relies on (1) his affidavit, accompanied by a copy of his driver's license, which was renewed in January 2003; (2) the testimony of his daughter, Jomarlyn Ramos; and (3) defense counsel's proffer of a statement by the landlord of the Wadsworth apartment, Santiago Reyes. In addition to its reliance

5

on confidential sources and co-defendants asserting that Ramos was a fugitive in the Dominican Republic during the period in question, the Government disputes the reliability and credibility of each of the sources offered by Ramos.

Approximately ten days before his trial was scheduled to commence, Ramos submitted the instant motion. In the affidavit accompanying his motion, Ramos avers that "from September 1998 . . . until March 2004" he "continued to live with [his] family" at the Wadsworth apartment. (Ramos Aff. ¶¶ 2-3, Feb. 2, 2006.) Additionally, he asserts that he "did not seek to avoid 'apprehension or prosecution' during that period," that he continued to work in the area, and that he obtained a renewal of his New York State Driver's License, which listed the Wadsworth apartment as his address. (Ramos Aff. ¶ 4.) The Government disputes the verity of Ramos's affidavit, pointing to the defendant's conflicting statements to the Pretrial Services Office upon his arrest.[1]

_____

[1] There is some question as to the admissibility of a defendant's statements to the Pretrial Services Office in this context. Although 18 U.S.C. § 3153 provides generally for the confidentiality of statements made to Pretrial Services, it contains express exceptions to this rule, and the Second Circuit has recognized other limited exceptions. For instance, the contents of the Pretrial Services Report are admissible on the issue of guilt in "a prosecution for failure to appear for the criminal judicial proceeding with respect to which pretrial services were provided." 18 U.S.C. § 3153(c)(3). Additionally, the Second Circuit recently held that pretrial service interview statements are admissible at trial to impeach the defendant's

According to the Pretrial Services Report ("PTS Report"), Ramos stated that "he returned to the Dominican Republic in 1998 and re-entered the United States in 2001." (PTS Rep. ¶ 1.) He also indicated that he "traveled to the Dominican Republic in 2002 for approximately 10 months." (PTS Rep. ¶ 1.) Regarding his residence, Ramos told the Pretrial Services officer that he lived at apartments on 178th Street in the Bronx and on 113th Street in Manhattan in the time period preceding his arrest. (PTS Rep. ¶ 1.) Finally, the defendant told the Pretrial Services officer that he was unemployed and financially supported by his 178th Street roommate for the 8 months prior to his apprehension, and that prior to his unemployment he worked as a newspaper delivery person in New York and as a freelance construction worker in the Dominican Republic. (PTS Rep. ¶ 2.)

Ramos also relies on the testimony of his daughter, who appeared at the evidentiary hearing preceding this Opinion. A visibly shaken Ms. Ramos testified that her father lived with the family during the five and a half year interval between the indictment and the arrest. Ms. Ramos testified that she had attended a family vacation with her family in the summer of

credibility. United States v. Griffith, 385 F.3d 124, 126 (2d Cir. 2004). Taking these precedents into consideration, this Court is satisfied that a defendant's statements to pretrial services are admissible, at the very minimum, to impeach the defendant's credibility at a pre-trial hearing held for the purpose of determining the allocation of responsibility for the defendant's absence prior to his arrest.

1998, returning in September of that year with the rest of the family except for her father. Ms. Ramos testified that her father returned to the Wadsworth apartment at the end of 1998 and remained with the family at that apartment for the following five years, interrupted by absences of varying duration. (Hr'g Tr. 4-14.)

The Government used its cross-examination of Ms. Ramos and summation of the evidence at the hearing to question the extent to which Ms. Ramos's testimony supported her father's position. During cross-examination, Ms. Ramos recalled the Government's search of the Wadsworth Apartment in September 1998, speaking to the traumatic nature of the search and the arrest of several co-defendants in the building. Ms. Ramos recognized that the agents were looking for her father. She testified that she and her mother spoke with him by telephone the day after the arrest, while he was still in the Dominican Republic, and told him about the events of the previous day. (Hr'g Tr. 16-20.) On cross, the Government highlighted Ms. Ramos's hazy recollection of her father's residence during the five and a half years between the search and his arrest. (Hr'g Tr. 20-22.) Finally, the Government pointed to Ms. Ramos's candid admission at the end of her direct examination that she loved her father and would not hesitate to lie for him. (Hr'g Tr. 14-15.)

Ramos also proffered a statement by the superintendent of the Wadsworth apartment building, Santiago Reyes, that Ramos continued to live at the apartment building from September 1998 until March 2004. (Hr'g Tr. 25.) The Government, however, introduced accounts of its own conversations with Mr. Reyes in the days preceding and following defense counsel's conversation with him. According to the Government, Mr. Reyes indicated that Ramos had left for the Dominican Republic in the summer of 1998 and that he had not seen Ramos at the apartment during the five year delay, but that Ramos's family continued to live in the apartment during that time. (Hr'g Tr. 41-43.) As Mr. Reyes declined an invitation to testify at the hearing, the Court is unwilling to rely on either of these conflicting accounts.

**II. DISCUSSION**

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." U.S. Const. amend. VI. In reviewing a defendant's motion to dismiss an indictment for violating the Speedy Trial Clause, courts examine four factors: (1) the length of the delay, (2) the reason for the delay, (3) the timeliness of the defendant's assertion of his right, and (4) the prejudice to the defendant caused by the delay. Barker v. Wingo, 407 U.S. 514, 530 (1972). The Supreme Court later expanded on the Barker factors, explaining that the first factor serves as a sort of

threshold inquiry; by showing that the length of the delay is "presumptively prejudicial," the defendant triggers an analysis of the remaining factors. Doggett v. United States, 505 U.S. 647, 651-52 (1992) (citing Barker, 407 U.S. at 530-31). The length of delay may then be considered in connection with the remaining factors of the speedy trial inquiry. Id. at 652.

As the Government does not dispute that the five and a half year delay in this case is presumptively prejudicial, an examination of the remaining factors is required.

**A. Reason for the Delay**

As is so often the case, the resolution of this motion turns on the reason for the delay. See, e.g., United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988); United States v. Perez-Cestero, 737 F. Supp. 752, 763 (S.D.N.Y. 1990). Doggett clarified that the central inquiry of this factor is "whether the government or the criminal defendant is more to blame for the delay." 505 U.S. at 651. Where the Government asserts that the defendant was a fugitive avoiding prosecution, it must establish that it has fulfilled its "obligation to exercise due diligence in attempting to locate and apprehend the accused." Rayborn v. Scully, 858 F.2d 84, 90 (2d Cir. 1988) (citations omitted). "The court's determination of whether the Government has made sufficient efforts to satisfy the 'due diligence'

requirement is 'fact-specific.'" <u>Perez-Cestero</u>, 737 F. Supp. at 763 (citing <u>Rayborn</u>, 858 F.2d at 90).

Immediately after the criminal complaint was filed, the Government obtained an arrest warrant for Ramos and a search warrant for his apartment. Law enforcement executed the search warrant the very next day. During the search, law enforcement questioned Ramos's family as to his whereabouts and arrested several co-conspirators in the building. According to Jomarlyn Ramos, the defendant's then 11-year-old daughter, she and her family became aware that her father was one of the targets of the search.

At approximately the same time the search warrant was executed, the Government took a number of prospective steps to apprehend Ramos. First, the Government initiated weekly conversations about the case with a confidential informant.[2] These conversations continued for approximately two years after the initial arrest attempt. The source never contradicted his assertion that Ramos had fled to an unspecified location in the Dominican Republic. Second, the Government instituted surveillance of Ramos's Wadsworth apartment for several uninterrupted hours a week for six months following the search, staffing the stakeout with personnel familiar with Ramos's

---

[2] The informant had already demonstrated his reliability by providing the Government with the tip that led to the nearly 200 kilogram cocaine seizure underlying the indictment.

appearance. Law enforcement did not see Ramos during this six month period. Finally, Ramos's personal details were entered into three criminal databases, transmitting his information to federal and local law enforcement throughout the nation.[3] If Ramos attempted to enter the country legally, Customs would be alerted of the outstanding warrant.

Under the circumstances of this case, the Government did not have a duty to extradite Ramos. Despite its firmly held belief that Ramos had fled, the Government was unaware of his precise location in that country. Additionally, Special Agent Zealor recalled his recent conversation with the Department of Justice's authority on Dominican extraditions, Rudolfo Orjales. According to Mr. Orjales, despite the existence of an extradition treaty, the United States did not extradite anybody from the Dominican Republic prior to 1998, and subsequent extradition requests were limited to violent offenders. In light of these difficulties, extradition was not a practical option. See Blanco, 861 F.2d at 778 ("Due diligence does not require the

---

[3] Shortly before the filing of this Opinion, Ramos submitted a copy of an FBI record indicating that Special Agent David A. Chaves deleted certain vehicle information from Ramos's NCIC database file on July 12, 2000. (Def.'s Letter Enclosure, Feb. 27 2006.) Presumably, the defendant submitted this document to raise an inference that the Government failed to properly maintain his file. Nevertheless, the document also raises an inference that the FBI continued to monitor Ramos's file by deleting information that it had determined to be unrelated to the suspect. I find this latter inference more persuasive.

government to pursue goals that are futile."). Further, courts in the Second Circuit have been clear that a "formal request for extradition need not be made before due diligence can be found to exist." Perez-Cestero, 737 F. Supp. at 764 (citing United States v. Diacolios, 837 F.2d 79, 83 (2d Cir. 1988)).

The first time the FBI was alerted that Ramos had been positively identified, at the impound lot in March 2004, it immediately responded, but found that Ramos had already disappeared. Rather than accepting the near-miss as a lost opportunity, the FBI demonstrated the seriousness of its pursuit, and initiated surveillance of the lot. Agents arrested Ramos the next day, despite Ramos's attempts to avoid a confrontation with law enforcement. The Government's persistent and successful effort to apprehend Ramos on the first occasion that he was identified is indicative of its diligent efforts to apprehend the defendant.

As the Second Circuit has long recognized, "law enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown." Rayborn, 858 F.2d at 90. During the five and a half years prior to Ramos's arrest, the Government received consistent and reliable evidence that Ramos had fled to an undisclosed location in the Dominican Republic. In light of its reasonable belief that Ramos had fled the country, the

Government has provided ample indication of its good faith, diligent efforts to apprehend the defendant with minimal delay.

The Court is not convinced by Ramos's argument that the Government failed to satisfy its due diligence obligation. The cornerstone of Ramos's argument is that he lived openly at the Wadsworth apartment for the five years preceding his arrest. As demonstrated below, the evidence supporting this argument is not sufficient to either undermine the Government's contention that it believed Ramos had fled to the Dominican Republic, or support Ramos's contention that the Government was guilty of negligence or a lack of diligence in its pursuit.

Ramos argues that his affidavit is more reliable than the unverified PTS Report that contradicts it. The Court does not agree. The affidavit is entirely self-serving and lacking in detail. In addition, it was filed nearly two years after the disputed time period, while the PTS Report summarizes the statements provided by Ramos immediately following his arrest. The Court refrains from adopting the contents of the PTS Report, but it does note that the timeline suggested by that report is consistent with the renewal of Ramos's driver's license and that it matches the defendant's statement of his address at the time he was booked.[4] In light of these conflicting reports, the Court

---

[4] The address Ramos provided at booking, 245 178th Street, is repeated inside the PTS Report. Though the contents of the PTS

is unwilling to credit Ramos's affirmation that he lived at the Wadsworth apartment during the entirety of the five and half year delay.

Ramos's New York State Driver's License is the one piece of evidence supporting his assertion that he lived at the Wadsworth apartment at any time during the five and a half year delay. However, the license, which was renewed in January 2003, and lists the Wadsworth apartment as the defendant's address, is insufficient by itself to permit much more than a weak inference that the Government is guilty of some small degree of negligence in failing either to place a stop-order on the license or to notice the license's renewal.[5] In the first instance, considering

---

Report are only admissible in limited circumstances, see supra note 1, courts have found that the identifying information a defendant provides at booking is admissible even on the issue of the defendant's guilt. U.S. v. Keeper, 977 F.2d 1238, 1242 (8th Cir. 1992) (per curiam).

[5] In a letter dated February 27, 2006, the Government enclosed a copy of the license renewal form that it had received from New York Department of Motor Vehicles ("DMV") Investigator Anthony Dixon. (Government Letter Enclosure, Feb. 27, 2006.) Mr. Dixon also indicated that Ramos renewed his license in Peekskill, New York in January 2003. Although the defendant welcomes this information as proof that he was not avoiding arrest and that the Government failed its obligation to diligently pursue him, the mere fact of the license renewal does not prove so much. Mr. Dixon also informed the Government that the DMV does not cross-check information against law enforcement databases (Government Letter 1), thus the FBI would not have been notified about the license renewal. Further, the fact of the license renewal remains the sole piece of reliable evidence that Ramos provided in support of his assertion that he was living openly, without fear of arrest, anywhere in New York during the period of delay. Ramos's presence in Peekskill, New York, some forty miles north

its belief that the defendant had fled the country, the Government had little reason to believe a stop-order would be beneficial in this case. In the second instance, Ramos failed to establish that the renewal of a driver's license would trigger a police inquiry or that the issuance of a driver's license alone is adequate to establish the Government's negligence. Cf. United States v. Forrester, 837 F. Supp. 43, 46 (D. Conn. 1993), aff'd, 60 F.3d 52 (2d Cir. 1995).

The remaining evidence offered to support Ramos's motion is no more compelling. At the hearing, Ramos offered the testimony of his daughter and proffered defense counsel's conversation with the superintendent of the Wadsworth apartment. Although Ramos's daughter testified that the defendant lived at the Wadsworth apartment from late 1998 until the time of his arrest, several indicia undermine the credibility of her testimony.[6] Ms. Ramos was visibly upset throughout the course of her testimony and admitted that she "didn't feel comfortable and [was] scared of [testifying]." (Hr'g Tr. 23.) Though she denied that she had prepared her testimony with her mother, Ms. Ramos completed her

_____

of the Wadsworth apartment, in January 2003 proves little beyond that fact.

[6] Even assuming the truth of Ms. Ramos's testimony, it conflicts with her father's account. While Ramos asserts that, from September 1998 until March 2004, "he continued to live with [his] family" (Ramos Aff. ¶ 3), his daughter testified that he was in the Dominican Republic from July 1998 until the end of that year, and was then sporadically absent from the household over the next five years. (Hr'g Tr. 9-10.)

direct examination by confirming that she understood the importance of the hearing and would not hesitate to lie for her father. (Hr'g Tr. 14-15.) With respect to the Wadsworth apartment's superintendent, because Ramos and the Government's accounts of Reyes's recollection are directly contradictory, the Court declines to credit the account put forward by either party.

At no point of these proceedings has Ramos contended that he was unaware of the indictment. Even if the Court was to credit Ramos's story that he remained in the country, the evidence supports an inference that he actively avoided police prosecution throughout the period of delay. First, Ramos knew that his apartment had been searched, and must have been aware that he was the object of that search. His family knew that Ramos was being sought, and his daughter indicated that she and her mother brought the event to his attention the day after the search was conducted. Second, if Ramos was living at the Wadsworth apartment in the six months following September 1998, it seems highly unlikely that, by sheer chance, he would have consistently avoided identification by the Government's weekly surveillance efforts. Finally, Ramos's behavior during his March 2004 apprehension, leaving the premises after the FBI was notified and retrieving the car from a different location the

next day, suggests that Ramos was avoiding a run-in with the authorities.

Although Ramos emphasizes the similarity of his case to various precedents, the analogies are unavailing. Defendant's reliance on Doggett is misplaced. In that case, after an indictment had been outstanding for approximately a year and a half, the Government learned that the defendant was in custody in Panama. 505 U.S. at 649. Realizing that an extradition request would prove futile, but aware of Doggett's precise location, the Government asked the Panamanian government to expel him. Id. When Panamanian authorities failed to comply, the Government simply lost track of the defendant, despite having been provided notice that Doggett had departed to Colombia. Id. After his travels in Colombia, Doggett returned to the United States, "pass[ing] unhindered through Customs," and lived openly for six years, with no awareness that an indictment had been returned against him. Id. at 649, 652-53.

The important indicators of government negligence in Doggett are absent in this case. Here, the Government never learned precisely where Ramos was, thus never negligently lost track of him. While Doggett proved that he had passed through Customs unhindered, Ramos has made no similar showing of his

open return to the United States.[7] Finally, Ramos must have been aware of the indictment against him at a very early stage, while the defendant in Doggett was found wholly unaware of the indictment prior to his arrest.

This case is also readily distinguishable from United States v. Ostroff, 340 F. Supp. 2d 362 (S.D.N.Y. 2004). There, the defendant was indicted, and a warrant issued for his arrest, in 1994. Id. at 364-65. Subsequent to the indictment, the defendant was arrested twice. Ostroff supplied the same alias at both arrests, and the FBI was notified of this alias prior to the second arrest. In both occasions he was released. Id. at 365. By 2000, Ostroff was again living openly under his own name. He registered with numerous state and federal services in Florida, obtained a driver's license, made personal appearances at the Social Services Administration, and voted in elections. Id. Ostroff was finally arrested, still unaware of the indictment, in 2003. Id.

Perhaps the most noteworthy likeness between Ostroff and this case is that the defendant in each case obtained a driver's license while under indictment. Beyond that fact, however, there is little similarity. While Ostroff was arrested twice after

---

[7] Regardless of which account is credited, Ms. Ramos's, the Government's, or Ramos's statements to the Pretrial Services Office, it seems clear that Ramos was in the Dominican Republic when the arrest warrant was issued, and returned to the United States at some time after the search of his apartment.

his indictment and released in both instances, Ramos's first arrest led directly to his trial in this case. Further, the evidence supporting Ostroff's claim that he was living openly far surpasses the evidence supplied by Ramos. Ramos has provided little more than the fact of his driver's license renewal. In addition to his driver's license, Ostroff provided evidence of an appearance at the Social Security Administration, voter registration, and full integration in his community. While the Court is hesitant to say that the level of negligence apparent in Ostroff would be required to support dismissal of an indictment on speedy trial grounds, the facts of that case provide little support for dismissal here.

In summary, Ramos is more to blame for the pre-arrest delay in this case. The Government clearly satisfied its due diligence requirement prior to January 2003, during which time the prosecutorial delay resulted from Ramos's avoidance of prosecution. The sole piece of evidence that could have alerted the FBI to Ramos's presence in the United States, the renewal of Ramos's driver's license in January 2003, is insufficient by itself to substantially undermine the Government's display of diligence. Indeed, this single item pales in comparison to the amount of evidence put forward in cases where a speedy trial violation has been found. Although the Government is partially responsible for the delay after January 2003, it is only

responsible for some small degree of negligence over the final fourteen months of the delay. See Rayborn, 858 F.2d at 91-92 (asserting that the government's negligent delay should be considered less harshly than deliberate delay and that "negligence and lack of diligence alone [do] not mandate dismissal"). On balance, in light of the defendant's attempts to avoid prosecution, this factor weighs against Ramos.

**B. Assertion of the Right**

The defendant's timely assertion of his right to a speedy trial carries more weight in a proceeding that contests post-arrest delay than in a proceeding that contests the delay between indictment and arrest. Where pre-arrest delay is complained of, and the defendant "only asserted [his] claim after [his] arrest, this factor does not help [his] case." Blanco, 861 F.2d at 780. Courts in this district have noted that "where the defendant is unaware of the indictment, he cannot 'be taxed for invoking his speedy trial right only after his arrest.'" Ostroff, 340 F. Supp. 2d at 367 (quoting Doggett, 505 U.S. at 654). However, "the lack of timeliness, vigor, or frequency of [a defendant's] assertions militates against according them strong evidentiary weight." Rayborn, 858 F.2d at 93.

The circumstances of Ramos's assertion of his right do not weigh in his favor. The Court has already concluded that Ramos

must have been aware of the indictment. Yet the defendant did not assert his right to a speedy trial until after his arrest. When he finally did assert his right to a speedy trial, Ramos waited until over a year after the arrest, after his withdrawn guilty plea, and merely a week before trial. On the other hand, Ramos claims that he was unaware of his right to a speedy trial until immediately before moving for dismissal. Further, the right to a speedy trial does not detach on the basis of timing alone. Accordingly, although this factor leans against Ramos, the Court will not weigh it heavily against him.

### C. Prejudice to the Defendant

Prejudice to the defendant is perhaps the muddiest of the Barker factors. As discussed above, see supra Part II, an uncommonly long delay creates a presumption of prejudice, triggering an analysis of the remaining factors. The strength of that presumption, however, is intertwined with the reason for, and length of, the delay. Courts in this Circuit have recognized that "in the absence of particular prejudice, 'presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other Barker criteria . . . it is part of the mix of relevant facts.'" United States v. Solomon, No. 95 Cr. 154 (LAP), 1996 WL 399814, at *5 (S.D.N.Y. July 16, 1996) (quoting Doggett, 505 U.S. at 655). With regard to the reason for delay, Doggett noted that government negligence is less prejudicial

than deliberate delay and explained that "the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows." 505 U.S. at 657. In other words, the longer period of delay that is attributable to the government, the more important the presumption of prejudice.

Here, Ramos relies primarily on presumptive prejudice stemming from the delay. As discussed earlier, see supra at Part II.A, a maximum of fourteen months of the delay are partially attributable to the Government. Those final months of delay are also partially attributable to Ramos's avoidance of prosecution, thus carry only a hint of presumptive prejudice to the defendant. Further discounting the weight of any presumptive prejudice, the Government is guilty not of deliberate delay, but for some degree of negligence in its pursuit of the defendant. Finally, the fourteen month delay is shorter than delays that have typically resulted in speedy trial violations. See e.g., Doggett, 505 U.S. at 657 (six years of delay attributable to government negligence); Ostroff, 340 F. Supp. 2d at 371 (ten years of delay attributable to government negligence). See also United States v. Jones, 91 F.3d 5, 9 (2d Cir. 1996) (reversing the district court's finding of a speedy trial violation on the basis of twelve months of government negligence without "some

additional compelling circumstance, such as bad faith by the prosecution or actual prejudice").[8]

Defendant's heavy reliance on presumptive prejudice would be considerably more compelling if the Government was primarily responsible for the delay, or was responsible for a greater portion of the delay. Because this Court has found that the Government is only minimally to blame for the delay, the presumption of prejudice is correspondingly weakened. Even where some portion of the delay is attributed to the government's negligence, Doggett recognized that the defendant may not always be entitled to relief "when the presumption of prejudice . . . [is] extenuated, as by the defendant's acquiescence" to the delay. 505 U.S. at 658 (citing Barker, 407 U.S. at 534-36). The defendant has failed to rebut the strong inference that he was

---

[8] Ramos relies on United States v. Bergfeld, 280 F.3d 486 (5th Cir. 2002), and United States v. Shell, 974 F.2d 1035 (9th Cir. 1992), to support his contention that a presumption of prejudice automatically shifts the burden to the government for rebuttal. While a successful rebuttal may discharge a presumption of prejudice, it is only necessary where the Barker factors as a whole weigh in favor of the defendant. For instance, in Shell, the Government was responsible for five years of negligence on account of its mishandling of the defendant's file. 974 F.2d at 1036. Similarly, in Bergfeld, the five year delay resulted from the government's complete failure to prosecute. 280 F.3d at 487-88. In addition, a dissent in Bergfeld argued that divided responsibility for the delay should have had an effect on the strength of prejudice, a factor which I have taken into account here. Id. at 492 (Garwood, J., dissenting). Finally, while Doggett indicates that the government may rebut a strong presumption of prejudice, the Court also provided for extenuation of the presumption by the defendant's acquiescence, an eventuality that I have taken into consideration below.

avoiding prosecution throughout the delay. This avoidance of prosecution exemplifies the type of acquiescence that undermines the presumption of prejudice inherent in prosecutorial delay.

Ramos also contends that he is able to show specific prejudice. He argues that he is prejudiced by the death of a co-conspirator, Santo De La Cruz, whose voice will be heard on tape recordings relied on by the Government. Ramos fails to specify how De La Cruz's words will incriminate him, but generally alleges that he will be prejudiced by his failure to "cross-examine the principal 'witness' against him." (Def.'s Mem. 11, Feb. 22, 2006.) Although the inability to confront a declarant capable of providing inculpatory evidence may harm the defendant, the degree of prejudice is far smaller than if the defendant had demonstrated that the delay had led to the loss of some exculpatory evidence.[9] In fact, the death of a co-conspirator that will no longer be able to testify against Ramos will likely prejudice the Government as much as it would prejudice the defendant. Further, Ramos does not provide any indication of when De La Cruz died. This information is often important, especially where, as here, the defendant bears

---

[9] Courts more typically address claims that the loss of some exculpatory witness or evidence has led to particularized prejudice. See, e.g., Rayborn, 858 F.2d at 93-94; United States v. Leaver, 358 F. Supp. 2d 255, 272-73 (S.D.N.Y. 2004). Ramos cites no authority for the proposition that the death of a possibly inculpatory witness is sufficient to show particularized prejudice justifying dismissal of the indictment.

primary responsibility for the delay. See Rayborn, 858 F.2d at 94. Ramos's allegation of particularized prejudice is speculative, at best.

In summary, the weak presumption of prejudice and the lack of any clear particularized prejudice from the delay cannot be said to weigh heavily against the Government.

## D. Balancing the **Barker** Factors

Though five and a half years passed between indictment and arrest, the Government established that it pursued the defendant with good faith and diligence over the majority of the delay. Combined with the evidence that Ramos avoided prosecution during his absence, the reason for the delay weighs against him. The untimely assertion of his right also weighs against the defendant, albeit weakly. In light of these factors, the weak presumption of prejudice to the defendant is insufficient to overcome the factors weighing against him, thus Ramos's speedy trial claim fails and his motion to dismiss the indictment is denied.

SO ORDERED.

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          February 28, 2006